## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL ENNO, Individually and on behalf of all others similarly situated, | : : : | |
| | : | Case No: |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action |
| | : | |
| VBIT TECHNOLOGIES CORP., VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, KATIE VO, SEAN TU, JIN GAO, LILLIAN ZHAO, JOHN DOES 1-10, AND ABC COMPANIES 1-10; | : : : : : : : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants. | : : | |

## <u>CLASS ACTION COMPLAINT</u>

Now comes the Plaintiff, Michael Enno, individually and on behalf of all others similarly situated, and alleges as follows:

### INTRODUCTION

1.      This is a breach of contract and fraud class action against a crypto-mining company run by a group of individuals, possibly as a Ponzi scheme.

2.      The Defendants lured Plaintiff and other class members into signing uniform contracts for crypto-mining hosting services, but it is now clear that Defendants were perpetrating a fraudulent scheme.

3.      Plaintiff and other class members each paid at least tens of thousands of dollars—sometimes more—in down payments and monthly hosting fees, and in exchange Defendants agreed to sell computer hardware packages that were set-up and hosted by Defendants to "mine" for valuable cryptocurrency, including Bitcoin.

4.      Plaintiff Michael Enno signed a Payment and Hosting Agreement Contract with Defendants VBit Technologies Corp. and VBit Mining LLC on March 20, 2021, a copy of which is attached hereto at Exhibit "A" (the "Agreement").

5.      A few days before he signed the Agreement, Plaintiff Enno traveled by plane from his home in Illinois to meet with Defendants in person at their offices at 1625 Washington Avenue in Philadelphia to judge for himself whether the company was genuine. After spending nearly a day witnessing Defendants portray themselves as a thriving small business, Plaintiff was satisfied that the company was legitimate.

6.      Less than a year later, at the end of January 2022, VBit Technologies was purportedly acquired by Defendant Advanced Mining Group, an Asian-based company.

7.      Then, in or about June 2022, Plaintiff discovered that he was unable to make withdrawals of Bitcoin from his virtual wallet, which was located in an online dashboard hosted by Defendants.

8.      At first, Defendants stated that the problems were due to temporary technical glitches or batching problems that would be fixed, but the virtual wallets remain frozen to this day and Plaintiff and class members cannot access their money.

9.      Defendants are not performing the services that they promised they would perform pursuant to the Agreement.

10.      Defendants' offices at 1625 Washington Avenue in Philadelphia are now shuttered and empty.

11.      Defendants have committed fraud and have breached Plaintiff's Agreement as well as the contracts of all other class members.

12.     As a result of Defendants' fraudulent conduct, described in more detail below, Plaintiff has been forced to commence this litigation on behalf of himself and the proposed Class.

13.     Plaintiff thus brings this class action complaint, on behalf of himself and all others similarly situated, alleging claims for breach of contract, fraud, conversion and unjust enrichment.[1] Plaintiff asks this Court to award him and the Plaintiff Class damages and all such other relief to which they are entitled.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are 100 or more Class Members and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs. Additionally, at least one Class member is a citizen of a state different from the corporate domiciles of the Defendants.

15.     This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

- The class, which includes an unknown number of persons but certainly more than 100, is so numerous that joinder of all members is impractical;

- There are substantial questions of law and fact common to the class; and

- This case is properly maintainable as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

    (a)    questions of law and fact enumerated below, which are all common of the class, predominate over any questions of law or fact affecting only individual members of the class;

---

[1] It remains unclear at this time whether the nature of Defendants' activities constituting fraud and breach of contract also encompasses violations of state and federal securities laws. There is some reason to suspect this is the case based on a Consent Order signed on June 18, 2022 between VBit Technologies, Inc. and the State of Washington Department of Financial Institutions, Securities Division. *See* Consent Order, attached hereto as Exhibit "B." Should further investigation reveal it to be appropriate, Plaintiff and the Class reserve their right to amend and add such claims and allegations, consistent with the Rules of Civil Procedure.

(b)     a class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

(c)     the relief sought in this class action will effectively and efficiently provide relief to all members of the class; and

(d)     there are no unusual difficulties foreseen in the management of this class action.

16.     Venue is proper in this Court under 18 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because Defendants transact their affairs in this district; a substantial portion of the events giving rise to this suit occurred in this district; and a substantial part of property that is the subject of this action is believed to be situated in this district.

17.     The Court has personal jurisdiction over all the Defendants, who have at least minimum contacts with the Commonwealth of Pennsylvania because the Defendants conduct business there and have availed themselves of Pennsylvania's markets through promotion, sales and marketing efforts as well as the Defendants' headquarters being located at 1625 Washington Avenue, Philadelphia, Pennsylvania.

18.     The Court has supplemental jurisdiction over state claims under 28 U.S.C. § 1367.

**THE PARTIES**

19.     Plaintiff, Michael Enno, is a resident of Springfield, Illinois who purchased and entered into a Payment and Hosting Agreement Contract with Defendants VBit Technologies Corp. and VBit Mining LLC on March 20, 2021. Plaintiff purchased Defendant's "Diamond" package, which consisted of a down payment of $24,314 plus monthly payments of $675.39 for three years. In return, Defendants promised to provide three years of hosting services plus lease of computer hardware equipment capable of providing 300,000 Giga Hash per Second. *See* Ex. "A."

20.     Defendant VBIT Technologies Corp. is a Delaware corporation with a principal place of business located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146.

21.    Defendant VBIT Mining LLC is a Delaware limited liability company with a principal place of business located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146. Upon information and belief, none of the members of VBIT Mining LLC reside in Illinois. According to Defendants, VBIT Mining LLC is a direct subsidiary of VBIT Technologies Corp. *See* Exhibit "A."

22.    Upon information and belief, Defendant Advanced Mining Group is an "Asian-based," foreign entity whose activities are located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146.

23.    Defendant Danh Cong Vo a/k/a Don Vo is an adult individual who, upon information and belief, resides at 1823 S. Dover Street, Philadelphia, PA 19145. Mr. Vo was the Chief Executive Officer of VBIT Technologies Corp. and VBIT Mining LLC until approximately January 2022.

24.    Defendant Ms. Katie Vo is an adult individual who, upon information and belief, resides at 1823 S. Dover Street, Philadelphia, Pennsylvania 19145.

25.    Defendant Mr. Sean Tu is an adult individual who, upon information and belief, resides at 1390 Braun Court, Eagon, Minnesota 55123. Mr. Tu is the former Chief Technology Officer of VBIT Technologies Corp. and VBIT Mining LLC, and present Chief Operating Officer of Advanced Mining Group.

26.    Defendant Mr. Jin Gao is an adult individual who worked at 1625 Washington Avenue, Philadelphia, PA 19146 and, upon information and belief, resides in Philadelphia, PA. Mr. Gao holds himself out as the Vice Chairman of Advanced Mining Group.

27.    Defendant Ms. Lillian Zhao is an adult individual, the current Chief Executive Officer of Advanced Mining and, upon information and belief, resides in Philadelphia, PA.

## FACTS

## <u>Background on Cryptocurrencies and Bitcoin</u>

28.    Cryptocurrency is a type of digital or virtual currency maintained by a decentralized network of participants' computers. Cryptocurrencies are unique as they exist solely on the internet and are unregulated and unmanaged by third parties, such as banks or governments.

29.    Cryptocurrency relies on blockchain technology, a distributed ledger system, to ensure the security and integrity of the virtual currency. Blockchain technology is a peer-to-peer system that tracks and records digital transactions around the globe.

30.    To use a blockchain system, a user first creates a wallet, which contains information used to move units of a cryptocurrency on a blockchain. When the user downloads or purchases a wallet, software in the wallet generates a private key (a large integer number). That private key is then used to mathematically generate a public key (also a large integer number), which is used to create an address (a mix of numbers and symbols). This address functions as the name suggests: it is the destination for a cryptocurrency payment.

31.    To avoid risks of double-spending, blockchain places a series of transactions into a block, issues a timestamp, then chronologically incorporates the blocks into a larger chain of all the blocks within the ledger. Each block is irreversibly connected by a proof-of-work protocol, the process by which a computer must solve a complex puzzle to authenticate each transaction and add it to the growing blockchain. This authentication process is known as "mining," or rather, the production of new coins or tokens.

32.    Bitcoin is probably the most well-known cryptocurrency in the world and it is identified by the symbol BTC. Bitcoin uses the "Bitcoin Blockchain" to track ownership and transfers "of every bitcoin in existence." To transfer bitcoins, a user must have a wallet, which,

again, is a unique digital file that stores the bitcoin information. Bitcoins can be acquired either by the mining process or simply by receiving them from someone else. The premise of Bitcoin was to use the blockchain technology for a peer-to-peer version of electronic cash that prevents fraudulent spending but without the oversight of regulatory policing.

## VBIT's Scheme and Cast of Characters

33.    VBIT Technologies Corp. and VBIT Mining LLC (together, "VBIT") were formed in 2018 to lease and sell Bitcoin mining equipment and hosting services to customers.

34.    VBIT offered and sold packages for computer hardware that specialized in Bitcoin mining. VBIT also sold its hosting services so that customers could mine Bitcoin with no effort required on the customer's part. As VBIT advertised on its website: "[y]ou don't need to do anything regarding the setup or maintenance of your hardware. We take care of logistics, installing and updating software, providing affordable electricity, and keeping your equipment cool and in working order."

35.    Further, through marketing and advertising, VBIT represented to customers, including Plaintiff, that it "operate[s] some of the largest and most efficient mining facilities in the world, with unprecedented access to clean, cheap power and expert staff."

36.    Thus, VBIT advertised to the public—Plaintiff included—that it would host its customers' individualized computer hardware in its world-class datacenters, that its customers would not need to actively participate in the mining of Bitcoin, and in exchange the customer would be required to pay VBIT a fee to cover operational and other costs.

37.    Upon information and belief, Mr. Vo co-founded VBIT and was VBIT's Chief Executive Officer from its founding in 2018 through January 2022.

38.    Ms. Vo, Mr. Vo's wife, allegedly was an integral part of VBIT's formation and operational development.

39.    Mr. Tu was VBIT's Chief Technology Officer, and presently serves as the Chief Operating Officer of Advanced Mining. According to Mr. Tu's LinkedIn profile, Mr. Tu sought to provide VBIT customers with "the technology, infrastructure, services and support than enables them to be successful miners and achieve their financial goals."

40.    Upon information and belief, Mr. Gao is a co-founder of VBIT and presently serves as Advanced Mining's "Vice Chairman."

41.    Ms. Zhao is advertised as the current Chief Executive Officer of Advanced Mining.

**Plaintiff was Lured into Purchasing a Contract with VBIT**

42.    In the past, Plaintiff has built and hosted his own cryptocurrency-mining machine. In early 2021, Plaintiff was looking for a way to mine for cryptocurrency cheaper and easier.

43.    Relying on Defendants' advertising and marketing pitches, Plaintiff started investigating VBIT as a way for him to mine for Bitcoin.

44.    In March 2021, before signing any contract, Plaintiff decided to travel by plane from his home in Illinois to meet with Defendants in person at their offices at 1625 Washington Avenue in Philadelphia.

45.    Plaintiff wanted to judge for himself whether Defendants were genuine.

46.    Plaintiff's main contact person at the company was Defendant Jin Gao. Mr. Gao invited Plaintiff to Philadelphia to check out Defendants' operations, and Mr. Gao helped Plaintiff make travel arrangements. Mr. Gao explained to Plaintiff that Defendants had good relationships with Bitcoin miners in China, which facilitated Defendants' access to computer equipment, even though availability was scarce.

47.     During his meetings at Defendants' offices, Plaintiff also personally met Defendant Don Vo.

48.     Aside from going out for cheesesteaks at lunch, Plaintiff spent nearly a whole day at Defendants' office at 1625 Washington Avenue in Philadelphia. While in the office, Plaintiff witnessed numerous employees at computer terminals and in their offices, busily servicing customers and seemingly carrying out the day-to-day activities of a thriving small business.

49.     Based on the representations made by Defendants in person and in the Agreement, Plaintiff was promised that: (a) he was leasing, with an option to buy, equipment that belonged to him; (b) he would have the ability to access his equipment; (c) the equipment was his and would continue to be his; (d) Defendants would host the equipment such that the output of the equipment's mining efforts would belong to Plaintiff; and (e) Plaintiff would always have access to an online dashboard or virtual wallet from which he could make withdrawals.

50.     After his visit at Defendants' office in Philadelphia, Plaintiff was satisfied that the company was legitimate and decided to enter into the Agreement.

51.     On March 20, 2021, Plaintiff purchased and entered into a Payment and Hosting Agreement Contract with Defendants VBit Technologies Corp. and VBit Mining LLC. Plaintiff purchased Defendant's "Diamond" package, which consisted of a down payment of $24,314 plus monthly payments of $675.39 for three years. In return, Defendants promised to provide three years of hosting services plus lease of computer hardware equipment capable of providing 300,000 Giga Hash per Second. *See* Ex. "A."

52.     In the Agreement, VBIT represented that it would be utilizing individualized mining equipment for the benefit of Plaintiff:

> The first monthly payment will be due 30 days after the first day
> your equipment is installed and actively running . . . .

*** 

1. Service.
1.1 Facility. Service Provider will provide server hosting facility, electrical power, and Internet access to Customer at Service Provider's and partner facilities (the "Facility") for the purpose of installing, maintaining, and operating Customer's leased or owned servers and ASIC chips (the "Equipment"), which may be updated from time to time to add or delete Equipment with written notification to the Customer.

Exhibit "A" at 1, 3.

53.    Under the Agreement, Plaintiff leased Bitcoin mining equipment from VBIT, but also had the option to purchase the equipment for $1, plus shipping and handling fees:

**Use and leasing rights with a buyout option to:**

Diamond Package consisting of dedicated Antminer S19 series computer server hashboards with an average of 330,000 GH/s computer computational power . . . .

***

. . . Customer can execute buyout option on Equipment referenced above at any time by submitting a written request of buyout execution and shipment of said equipment. Upon such request, Customer shall pay the shipping and handling fee described in section 2.1 of this agreement in additional to a $1.00 USD buyout and the balance of all payments described above.

Exhibit "A" at 1-2.

54.    Under the Agreement, Defendants exercised complete control over Plaintiff's equipment.

55.    Plaintiff has paid Defendants the full contract price of $24,314 plus monthly hosting costs of $675.39 in U.S. currency pursuant to the Agreement.

**VBIT Acquired by Advanced Mining in early 2022**

56.    In late January 2022, VBIT announced that it had been acquired by a company called Advanced Mining for $105 million.

57.     In a press release authored by VBIT, Advanced Mining was identified as "an Asian-based company primarily focused on bitcoin mining." A true and correct copy of the January 31, 2022 press release is attached hereto as Exhibit "C."

58.     In the press release, VBIT touts "Advanced Mining" as a company that has been "thriving in the crypto mining sector since 2015 and operating 12 data centers dedicated to bitcoin mining in Europe and Asia." *Id.*

59.     VBIT also stated that it was operating "27,000 Antminer S19 series and S17 series out of five data centers spreading across the globe in the United States, Canada and Kazakhstan with a new data center currently being built in the United States." *Id.*

60.     At this time, it is not clear whether Advanced Mining is a legitimate entity or a sham.

61.     Even if Advanced Mining is a duly authorized legal entity, by operation of law as a result of concepts of successor liability, or de facto merger or consolidation, Advanced Mining assumed all the obligations of VBIT.

62.     Advanced Mining conducts the same or substantially the same business that VBIT conducted before VBIT's purported acquisition.

63.     Upon information and belief, VBIT and Advanced Mining have the same or substantially the same ownership.

## **VBIT/Advanced Mining Default on their Contracts**

64.     In or about June 2022, Plaintiff discovered that he was unable to make Bitcoin withdrawals from his "virtual wallet," which was located in Defendants' proprietary "Advanced Mining" dashboard.

65.     At first, Defendants stated that the problems were due to temporary technical glitches that would be fixed, but the virtual wallets remain frozen to this day and Plaintiff cannot access his money.

66.     On June 27, 2022 and July 6, 2022, Defendants sent emails to all customers stating that Defendants would no longer be servicing the United States market.

67.     Defendants announced that they are no longer operating and maintaining computers and thus they are not performing the services that they promised they would perform under the contracts.

68.     Defendants' offices at 1625 Washington Avenue in Philadelphia are now shuttered and empty.

69.     Defendants' activities have all the markings of a Ponzi scheme and Defendants owe Plaintiff and the Class millions of dollars in damages consisting of cryptocurrency assets, plus equipment fees and hosting costs, as well as other contract damages.

70.     As of the date of the Complaint, Plaintiff is unable to withdraw Bitcoin from his "virtual wallet," despite Defendants' representations that Plaintiff could withdraw all Bitcoin that he owned at any time.

71.     Throughout June, July, August, and September 2022, Plaintiff made numerous phone calls to Defendants demanding the return of his assets, including but not limited to the $24,314, plus monthly payments of $675.39, that he paid Defendants under the Agreement.

72.     Defendants refused Plaintiff's demands and refused to comply with their contractual obligations.

73.     Specifically, Defendants have breached their contractual promises by: (a) failing to lease the equipment, including the Antminer S19 series computer server hashboards, as stated on

page 1 of the Agreement; (b) failing to provide hosting services as stated on pages 1 and 3 (paragraph 1.1) of the Agreement; (c) failing to ensure that the equipment has network access for mining activities in violation of paragraph 5.1 on pages 5-6 of the Agreement; (d) failing to allow Plaintiff use of the equipment as stated on page 1 of the Agreement; and, (e) converting and misappropriating the Bitcoin in Plaintiff's online dashboard or virtual wallet in violation of numerous sections including but not limited to paragraph 15 on page 11 of the Agreement.

74.    Plaintiff has fulfilled all conditions precedent prior to filing this Complaint.

## CLASS ALLEGATIONS

75.    Plaintiff Michael Enno brings this action, on behalf of himself and all others similarly situated, for the purpose of asserting the claims alleged in this complaint on a common basis.

76.    Plaintiff proposes a nationwide Class defined as:

> All persons who entered into a Payment and Hosting Contract or similar agreement with one or more of the Defendants, whose contract was in-force when Defendants uniformly stopped performing under the contracts in or about June 2022.

77.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

78.    Excluded from the Plaintiff Class are:

(a)    Defendants and any entities in which any Defendant has a controlling interest;

(b)    Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of any Defendant;

(c)    The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer or employees assigned to this case;

(d)    Any attorneys representing the Plaintiff or the Class; and

(e)  All governmental entities.

79.     Numerosity – Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that their individual joinder is impracticable. The exact number or identification of the Class Members is presently unknown, but it is believed that there are well over 10,000 Class Members. The identity of the Class Members is ascertainable. In addition to registration rolls maintained by the Defendants, the Class Members may be located and informed of the pendency of this action by a combination of electronic bulletins, e-mail, direct mail and public notice, or other means.

80.     Commonality – Fed. R. Civ. P. 23(a)(2). There are questions of law or fact that are common to the Class, and the relief sought is common to all members of the Class. Common legal and factual questions arise from the fact that all class members have the same contract and Defendants acted the same towards all class members when they froze all virtual wallets and discontinued hosting services in or about June 2022. The resolution of these legal and factual questions will determine whether all members of the Class are entitled to damages payable that reflect the value of all assets contained in digital wallets plus costs and fees paid for equipment and hosting services.

81.     Typicality – Fed. R. Civ. P. 23(a)(3). The claims and defenses of the representative parties are typical of the claims and defenses of the Class. All Plaintiff Class members have the same claims, i.e., that VBit Technologies Corp., VBit Mining LLC, and/or Advanced Mining are in breach of contract and that all Defendants are liable for fraud and conversion and have been unjustly enriched, causing injury and damage to Plaintiff and Class Members. If Plaintiff succeeds on his claims, that ruling will likewise benefit every other member of the Class. Any defenses that the Defendants raise are also likely to be raised equally against Plaintiff and all members of the Class.

82.     Adequacy – Fed. R. Civ. P. 23(a)(4); 23(g)(1). Plaintiff is an adequate representative of the Class because he fits the class definition and his interests do not conflict with the interests of the Class Members he seeks to represent. Plaintiff will prosecute this action vigorously for the benefit of the entire Class and agrees to participate in discovery and attend any Court hearings required of him. Plaintiff is represented by the law firm Golomb Spirt Grunfeld, P.C. ("GSG"), who are experienced and able attorneys with more than 35 years of combined experience in handling and litigating complex class actions. GSG has detailed knowledge about Defendants' scheme and the applicable law, and they have done substantial work identifying and investigating the potential claims in this action. GSG has the resources necessary to represent the Class and will commit those resources to this case to ensure that the interests of the Class will be protected.

83.     Predominance and Superiority – Fed. R. Civ. P. 23(b)(3). Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common questions of law or fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The principal legal and factual questions in this case—whether Defendants are in breach of contract and whether Defendants fraudulently stole millions of dollars in computer equipment and Bitcoin—are common to all Class Members.

84.     Once these questions are answered in the affirmative, all that will be required is the mechanical calculation of damages owed to each Plaintiff Class Member. These calculations will be easily done based on the information contained in Defendants' records. The Plaintiff Class Members have little interest in individually controlling the prosecution of separate actions.

85.     The large size of the Plaintiff Class, likely in the thousands, if not tens of thousands, and the minimal difficulties likely to be encountered in the management of the action as a class action, further support the conclusion that this case should be maintained as a class action.

86.     Joinder of all class members would be impractical, as would the maintenance of thousands, if not tens of thousands of separate lawsuits, each brought to resolve identical legal and factual questions. By contrast, there will be minimal difficulties in maintaining the action as a class action, including in terms of calculating damages.

87.     In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient to support separate actions. The cost to bring litigation on behalf of each class member exceeds the amount by which each individual plaintiff was damaged.

88.     Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The class, as defined herein, is ascertainable from the Defendants' records or from records which the Defendants have access and control.

## COUNTS

### COUNT ONE – BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

***Against Defendants VBit Technologies Corp., VBit Mining LLC and Advanced Mining Group***

89.     Plaintiff incorporates by reference the allegations in paragraphs 1-88.

90.     As described above, Plaintiff entered into a Payment and Hosting Agreement Contract with VBit Technologies Corp. and VBit Mining LLC for three years of hosting services

plus leasing complex computer equipment.  A true and correct copy of Plaintiff's contract is attached hereto at Exhibit A.

91.    Upon information and belief, Defendant Advanced Mining Group is a party to the Agreement by virtue of its acquisition of VBit Technologies Corp. and VBit Mining LLC in or about January 2022 for $105 million.

92.    The Agreement is a valid contract between Plaintiff and Defendants VBit Technologies Corp., VBit Mining LLC and Advanced Mining Group.

93.    The Agreement, like all similar contracts, impose on each party a duty of good faith and fair dealing in their performance and their enforcement.

94.    VBit Technologies Corp., VBit Mining LLC and Advanced Mining are in express default of their obligations to Plaintiff under the Agreement, specifically that Defendants would fulfill all the covenants, representations, and promises set forth in the Agreement through the end of the Agreement's term, including but not limited to,

(a)    the provision of individualized physical mining equipment and hosting services through the end of the term of the Agreement (see pages 1-2 and 3 (paragraph 1.1) of Agreement), and

(b)    that Plaintiff was the beneficial owner and would have the ability to freely withdraw the Bitcoin from his virtual wallet that was generated as output from Plaintiff's equipment (see pages 1-2, 3 (paragraph 1.1), and 11 (paragraph 15) of Agreement).

95.    Despite demand, Defendants have failed and refused to satisfy their obligations under the Agreement.

96.    As of the date of this Complaint, Defendants, jointly and severally, owe Plaintiff more than $30,000 under the Agreements, plus interest and other damages.

97.     Defendants expressly breached their contractual promise to provide the equipment and hosting services described in the Agreement in return for the payments made by Plaintiff.

98.     Defendants had a legal duty to act in good faith and deal fairly with their customers, including Plaintiff and all class members.

99.     Despite this duty, Defendants stole assets and money from Plaintiff Enno and other similarly situated consumers and thus breached the contract, including the duty of good faith and fair dealing. This breach proximately caused damages to Plaintiff Enno and other similarly situated Class Members who paid for equipment and hosting services that Defendants abruptly stopped providing.

100.    Plaintiff Enno and other similarly situated class members have been proximately injured as a result of Defendants' breach of contract, including express breach of contract, and breach of the duty of good faith and fair dealing and are thus entitled to damages proximately caused them by said breach.

WHEREFORE, Plaintiff and the Class demand judgment against Defendants for compensatory damages, interest, costs of suit, damages for delay, counsel fees and treble and punitive damages as provided by law.

## COUNT TWO – FRAUD

### *Against All Defendants*

101.    Plaintiff incorporates by reference the allegations in paragraphs 1-100.

102.    As discussed above, Defendants have made, and continue to make a number of materially misleading statements and/or omissions about their crypto-mining products and services. Defendants false statements and material omissions were made to Plaintiff in March 2021, both prior to and during his visit to Philadelphia, and to Plaintiff and all class members in

Defendants' advertising, marketing, and sale of their crypto-mining products and services, including:

a. that Defendants would not utilize Bitcoin mined by Plaintiff for their own use and benefit;

b. that Defendants were duly authorized to offer the mining equipment and hosting services as specifically detailed in the Agreement;

c. that Defendants were offering and maintaining individualized, hardware-hosted mining services, when in reality they were not doing so;

d. that Plaintiff was purchasing Bitcoin-mining hardware, when in reality the hardware was not available for purchase;

e. that Plaintiff could remove or "cash out" his mined Bitcoin at any time;

f. that Advanced Mining was a separate and distinct entity from VBIT;

g. Defendants' failure to disclose the real reason (or reasons) why Plaintiff and other class members have been unable to withdraw their funds from Defendants; and,

h. Defendants' failure to disclose the real reason (or reasons) why Defendants have stopped servicing the U.S. market.

103.    In deciding to enter into and remain in Agreements with Defendants, Plaintiff and the Class reasonably relied on these misrepresentations and/or omissions to form the mistaken belief that their money was being accepted by Defendants in exchange for authentic crypto-mining equipment and services.

104.    Defendants' fraudulent conduct was knowing and intentional. The omissions and misrepresentations made by Defendants were intended to induce and actually induced Plaintiff and Class Members to purchase illusory equipment and services.

105.    Defendants' fraud caused damage to Plaintiff and the Class, who are entitled to damages and other legal and equitable relief as a result.

106.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Defendants.

Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

WHEREFORE, Plaintiff and the Class demand judgment against Defendants for compensatory damages, interest, costs of suit, damages for delay, counsel fees and treble and punitive damages as provided by law.

## <u>COUNT THREE – CONVERSION AND MISAPPROPRIATION</u>

### *Against All Defendants*

107. Plaintiff incorporates by reference the allegations in paragraphs 1-106.

108. By their conduct, Defendants have converted and/or misappropriated funds belonging to Plaintiffs and individual class members.

109. Defendants have frozen the virtual wallets worth millions of U.S. dollars of Bitcoin owned by Plaintiff and other class members that are inaccessible.

110. Furthermore, Defendants had no authority to collect money or Bitcoin from Plaintiffs and the class members in return for equipment and hosting services that they did not provide and/or never intended to provide.

111. As such, Defendants converted and misappropriated the funds of Plaintiff and the members of the class without their consent.

112. The conversion and misappropriation of these funds are illegal, unjustified, outrageous, and intentional, insofar as it is believed and therefore averred that Defendants intended to perpetrate a Ponzi scheme.

113. Alternatively, if the conversion and/or misappropriation was not deliberate, it is the result of Defendants' recklessness and gross neglect.

114.    This conversion and misappropriation of funds benefitted and continues to benefit Defendants, while acting to the severe pecuniary disadvantage of Plaintiff and class members.

115.    Defendant should be ordered to remit all illegally taken funds to Plaintiff and the class members.

WHEREFORE, Plaintiff and the Class demand judgment against Defendants for compensatory damages, interest, costs of suit, damages for delay, counsel fees and treble and punitive damages as provided by law.

## COUNT FOUR – UNJUST ENRICHMENT

### *Against All Defendants*

116.    Plaintiff incorporates by reference the allegations in paragraphs 1-115.

117.    Defendants have been enriched and have received a benefit as a consequence of Defendants' perpetration of the Ponzi scheme described herein.

118.    Specifically, Defendants are enriched because they have frozen the virtual wallets containing millions of U.S. dollars' worth of Bitcoin owned by Plaintiff and other class members. Since only Defendants now have access and control of these wallets, this money has now been taken by Defendants.

119.    Furthermore, Defendants are enriched by their receipt of millions of dollars in down payments for equipment and monthly fees for hosting services paid by Plaintiffs and the class members in return for equipment and hosting services that were not provided.

120.    Plaintiff, and the Plaintiff Class, conferred a benefit upon Defendants.

121.    Defendants appreciated those benefits and accepted and retained those benefits under circumstances that would render it inequitable for Defendants to retain the benefits without re-payment to Plaintiff and the Class.

122.    Plaintiff and the Class were denied a benefit as a consequence of Defendants' actions.

123.    An injustice will result if Plaintiff's and the Class's recovery from the enrichment is denied. Defendants have no legal or equitable entitlement to the money and Bitcoin, and in fact Plaintiff and the Class have a legal and equitable entitlement to that money and Bitcoin. Defendants were never and not now entitled in equity or good conscience to be paid the millions of dollars by which they received as a result of their scheme.

124.    The money in equity and good conscience should be re-paid to Plaintiff and the Class, who have a better legal and equitable right and claim to the money.

125.    Plaintiff and the Class reasonably relied on conduct and assertions of Defendants in keeping their Bitcoin in Defendants' virtual wallets and paying the fees and costs associated with leasing and hosting equipment for Bitcoin mining.

126.    Recovery by Plaintiff and the Class would leave all parties concerned in the position they should be in but for Defendants' scheme.

127.    Plaintiff and the Class have been directly and proximately injured as a result of and at the expense of Defendants' unjust enrichment.

128.    Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff and the Class demand judgment against Defendants for compensatory damages, interest, costs of suit, damages for delay, counsel fees and treble and punitive damages as provided by law.

## REQUEST NO. 1

## PARTICIPATION THEORY OF LIABILITY

129.    Plaintiff incorporates by reference the allegations in paragraphs 1-128.

130.    With respect to Counts Two (Fraud), Three (Conversion), and Four (Unjust Enrichment), each of the Individual Defendants actively and directly participated in the conduct giving rise to such claims.

131.    The Individual Defendants' misrepresentations and other conduct set forth above constitute acts of misfeasance, as each of them personally undertook active efforts to misrepresent information that Plaintiff relied on before entering into the Agreements.

132.    Accordingly, Plaintiff requests that the Court hold Defendants, Danh Vo a/k/a Don Cong Vo, Katie Vo, Lillian Zhou, Sean Tu, and Jin Gao individually liable for the misfeasance that they committed against Plaintiff and each class member, which gave rise to Plaintiff's claims under Counts Two, Three, and Four.

## (ALTERNATIVE) REQUEST NO. 2

## REQUEST TO PIERCE THE CORPORATE VEIL

133.    Plaintiff incorporates by reference the allegations in paragraphs 1-132.

134.    With respect to all Counts, as an alternative to agency theories of liability, Plaintiff requests that the Court pierce the corporate veil and hold VBit Technologies Corp., VBit Mining LLC, and Advanced Mining Group jointly and severally liable for each other's acts and omissions for the following reasons, among others alleged herein:

  a.    Upon information and belief, Advanced Mining Group, VBit Technologies Corp., and VBit Mining LLC share or shared a common identity;

  b.    Upon information and belief, the assets of VBit Technologies Corp. and/or VBit Mining LLC capitalized Advanced Mining Group;

  c.    Upon information and belief, VBit Technologies Corp., and VBit Mining LLC *de facto* merged or consolidated into Advanced Mining Group;

  d.    There is a commonality of ownership and control between Advanced Mining Group and VBit Technologies Corp., and VBit Mining LLC; and

e.      Upon information and belief, Advanced Mining Group presently is utilizing assets, including real estate and intellectual property, that is or was owned by VBit Technologies Corp. and/or VBit Mining LLC

135.    Further, upon information and belief, VBit Technologies Corp., VBit Mining LLC, and Advanced Mining Group operated or operate without due regard for corporate or entity formalities.

136.    Upon information and belief, at all relevant times VBit Technologies Corp., VBit Mining LLC, and Advanced Mining Group have commingled their respective funds with each other.

137.    It would be patently unjust to permit any of VBit Technologies Corp., VBit Mining LLC, and/or Advanced Mining Group to avoid the obligations owed to Plaintiff and class members under the Agreements and applicable law.

138.    Accordingly, the Court should enter an order piercing the corporate veil, under both an enterprise theory, or alter ego and/or instrumentality theory of liability, as VBit Technologies Corp., VBit Mining LLC, and/or Advanced Mining Group have conducted business in such a way, intentionally or negligently and/or without regard to corporate or entity formalities, as to hinder potential creditors like Plaintiff and other class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, demands judgment against Defendants as follows:

(a)     An order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class Representative and his attorneys as Class Counsel to represent the Class Members;

(b)     Ordering Defendants to pay Plaintiff and the Class damages for all injuries Plaintiff and the Class have incurred to their business and property as a result of the Defendants' breach of contract;

(c)    Ordering Defendants to pay Plaintiff and the Class damages, including punitive damages, for all injuries Plaintiff and the Class have incurred to their business and property as a result of the Defendants' fraud;

(d)    Ordering Defendants to pay Plaintiff and the Class damages for all injuries Plaintiff and the Class have incurred to their business and property as a result of the Defendants' conversion;

(e)    Ordering Defendants to pay Plaintiff and the Class damages for all injuries Plaintiff and the Class have incurred to their business and property as a result of the Defendants' unjust enrichment;

(f)    An order entering judgment in favor of Plaintiff and the Class Members against Defendants;

(g)    An order piercing the corporate veil of VBit Technologies Corp., VBit Mining LLC, and Advanced Mining Group, both horizontally to reach the assets of each of the corporate defendants, and vertically to reach the assets of their principals;

(h)    An order determining that the individual defendants are jointly and severally liable with the corporate defendants for the tortious conduct alleged herein, under the participation theory of liability;

(i)    Awarding Plaintiff and the Class prejudgment interest, at the rate of 6% per annum, on a joint and several liability basis against Defendants;

(j)    Injunctive relief or an order of non-monetary relief as the Court may deem proper; and

(k)    An order awarding Plaintiff and the Class their reasonable attorneys' fees, cost and disbursement incurred as a result of this action.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Class Members hereby demand a jury trial on all claims so triable in this action.

Respectfully submitted,

_/s/ Kevin W. Fay_
Richard M. Golomb, Esquire
Kenneth J. Grunfeld, Esquire
Kevin W. Fay, Esquire
**GOLOMB SPIRT GRUNFELD, P.C.**

1835 Market Street, Suite 2900
Philadelphia, PA 19103
Phone: (215) 985-9177
Fax:    (215) 985-4169
Email: rgolomb@golomblegal.com
         kgrunfeld@golomblegal.com
         kfay@golomblegal.com
*Attorneys for Plaintiff and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7th day of October, 2022, I electronically filed the foregoing document with the clerk of court using the electronic case filing system, CM/ECF. The electronic case filing system sent a "Notice of Electronic Filing" to attorneys of record, who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Kevin W. Fay*
Kevin W. Fay

# EXHIBIT A



## Payment and Hosting Agreement Contract

By this contract, dated  3/20/2021        ,        **Michael Enno**        **,** hereafter known as "Customer" or "you", agrees to make payments to **VBit Technologies Corp and its subsidiary, VBit Mining LLC,** hereafter known as "we", "us" or "Service Provider", by the following schedule:

**Order Number:** 10023577

Down payment of $ 24314         will be paid to the Service Provider upfront, and a monthly payment in the amount and duration chosen below by Customer will be made by the Customer to the Service Provider.

Please select a monthly payment plan duration and amount below: 36 Monthly Payments

**36 Monthly payments in the amount of**    675.39

**24 Monthly payments in the amount of** 1,013.08

**12 Monthly payments in the amount of** 2,026.17

**6  Monthly payments in the amount of**

Tentatively Starts On:
4/20/2021

The first monthly payment will be due 30 days after the first day your equipment is installed and actively running. All subsequent payments will be due on the first of each month or the next business day after the first if the first of the month is a banking holiday. This payment schedule is enforceable by law, and the methods described below will be use in cases of delinquent payment.

In exchange for payments described above, Service Provider will render the following services to the Customer:

**Initial Fixed Hosting Term length\* of:** 3 Year Hosting

\*Fixed Hosting Terms can be updated from time to time with a signed Addendum A (Hosting Term Update Form).

**Use and leasing rights with a buyout option to:**

Diamond         Package consisting of dedicated Antminer S19 series computer server hashboards with an average of    **330,000**    GH/s computer computational power, hereafter known as "Equipment".

Use and leasing term length will be equivalent to Fixed Hosting and Monthly Hosting Term
lengths held by Customer. Customer can execute buyout option on Equipment referenced above
at any time by submitting a written request of buyout execution and shipment of said equipment.
Upon such request, Customer shall pay the shipping and handling fee described in section 2.1 of
this agreement in additional to a $1.00 USD buyout and the balance of all payments described
above.

**Payment Method:**

The balance due to Service Provider monthly will automatically be debited from Customer's
account provided below (ACH and Credit Card only).  The Payment method can be updated by
completing a Payment Update Form.

Please select one: ACH Bank Withdrawal (USA ONLY)

**ACH Bank Withdrawal (USA ONLY):**

  Account Holder Name: Michael Enno

  Account Billing Address: 4501 castle pines dr

  Street Address: 4501 castle pines dr

  City: Springfield

  State: Illinois

  Zip Code: 62711

  Bank Name: Cefcu

  Account Type: Checking

  Routing Number: 271183701

  Account Number: 0116698625

**Credit Card (2.9% additional convenience fee applies):**

  Cardholder Name:

  Card Number:

  Expiration Date:

  3 (*or 4 if AMEX*) Digit Security code on back of card:

Account Billing Address:

Street Address:

City:

State:

Zip Code:

**Monthly Invoice for Bitcoin (BTC) / Cryptocurrency Payment (Invoice will be sent to email address on file and must be paid through Customer's corresponding QABU account)**

By providing your account information, you are authorizing Service Provider to automatically charge and debit your account for the amounts listed in this agreement. At our discretion, we can process automatic credit card / debit card payments which will incur an additional convenience fee of **2.9%** for any past due amounts due to us.

At our discretion, we can automatically debit any of your wallets associated with Service Provider for any amounts due to us.

This agreement is binding, and failure to meet its terms will allow the Service Provider to take certain recourse. Customer will be allowed a five (5) day grace period from the due date to make the full agreed upon monthly payment. If Customer fails to make the full monthly payment within the five (5) day grace period, a Late Payment Fee will be added to payment (see section 3.5). If Customer fails to make full payment of the balance due within ten (10) days from the due date, the Customer's account will be considered in default and Customer will surrender any rights to the Equipment or output from the Equipment to Service Provider and no refunds or payments will be offered to Customer. In case of default, Service Provider may provide Customer with hardware equaling the average computational power of at least 25% of the original equipment package at its discretion.

In addition, the following terms and conditions apply:

**1.      Service.**

1.1.      Facility. Service Provider will provide server hosting facility, electrical power, and Internet access to Customer at Service Provider's and partner facilities (the "Facility") for the purposes of installing, maintaining, and operating Customer's leased or owned servers and ASIC chips (the "Equipment"), which may be updated from time to time to add or delete Equipment with written notification to the Customer.

1.2.      Uptime and Repairs. Service Provider guarantees at least 95% annual uptime based on the calendar year. If annual uptime falls below 95%, Service Provider will credit Customer hosting service credits based on the amount of downtime in excess of allowed downtime. All

maintenance and repair services are included in Fixed Hosting Terms. If Service Provider is unable to repair the Equipment, Service Provider will provide a one (1) time replacement that is equivalent to the Equipment for each unit of the Equipment over the entire term that the equipment or its replacement is hosted with Service Provider.

**2.      Term and Termination.**

2.1.     Term. The Agreement commences on the earliest date Service Provider notifies Customer that any Equipment has been received and turned on by Service Provider ("Installation") and shall remain effective until Customer notifies Service Provider in writing of intent of termination. You may request termination of the contract at any time, and request buyout and shipping of the hardware described in this contract to you. A shipping and handling fee for the corresponding package (listed below) in addition to a $1.00 USD buyout payment is required in these circumstances. This agreement may be changed by Service Provider at its discretion for reasonable cause.

Package Shipping and handling fees (USA rates, for international shipping please add 30%):

Copper:             50USD
Silver:             50USD
Gold:               75USD
Platinum:          225USD
Diamond:           775USD
Black Diamond: 1800USD

2.2.     Termination for Cause. Service Provider may terminate this Agreement for cause immediately following written notice to Customer if Customer: (a) fails to make any payment(s) due pursuant to this Agreement; (b) violates, or fails to perform or fulfill any covenant or provision of this Agreement, and any such matter is not cured within five (5) days after notification from Service Provider; or (c) enters into bankruptcy, dissolution, financial failure or insolvency, sale or merger with another person, corporation or entity, unless approved in advance by Service Provider.

2.3.      Effect of Termination. In the event of a Default by Customer, Customer agrees to pay immediately to Service Provider all amounts then owed. If Customer fails to make any such payments, Service Provider shall have the right to (a) sell or retain possession of; (b) reconfigure for Service Provider' use; or (c) remove and store at Customer's expense, all or any portion of the Equipment without any cost, obligation or liability of Service Provider to Customer.

**3.      Fees and Payment.**

3.1.     Initial Setup Fees. Customer shall pay Service Provider the Initial Setup Fees of $0 USD.

3.2.     Monthly Hosting Term Fees. At the expiration of Customer's hosting service term with Service Provider, described above in this contract, if Customer does not purchase another Fixed

DocuSign Envelope ID: 3499B377-24B4-4C9C-82A5-38EE1D4C7AC8

Hosting Term contract, Customer's account will convert into a Monthly Hosting Term contract. Monthly service fees for Monthly Hosting Term contracts are based on the Service Provider's published market price listed on its website (www.vbitmining.com) at time of billing and can change at Service Provider's discretion based on market conditions. Monthly Hosting Term services do not include any repair, warranty or insurance services.

3.3     Repairs. Any repairs not included in hosting term contracts will be billed at $150 per hour for labor. Parts pricing will be based on actual market cost plus 20%.

3.4.    Taxes. Where applicable, Customer is responsible for paying any and all taxes, including without limitation any federal, state, or local taxes on manufacture, sales, gross income, receipts, occupation, or use.

3.5     Other Service Fees.  Additional Service Fees may apply.  For updated fee information, please see the Service Fee Disclosure found on Service Provider's website (www.vbitmining.com).

3.6     Refund Policy. VBit Mining offers a 100% satisfaction guarantee policy and shall provide a full refund of all monies paid if a Customer notifies and returns the product to the Company within seven (7) days of the sales transaction (order date).

After this initial seven-day refund period, the Company nonetheless allows a Customer to return the product between eight (8) and thirty (30) days of purchase (order date) but such refund comes with a 50% restocking fee of the overall purchase price.

No refunds or exchanges will be accepted after thirty (30) days of purchase (order date). Shipping and handling charges incurred will not be refunded.

If Cryptocurrency is utilized for payment, any payment/refunds made will be based on the USD exchange rate at the time of transaction.

4.      Security Interest. Customer hereby grants a security interest in the Equipment in favor of Service Provider and its partners to secure the obligations of Customer under this Agreement. Service Provider may, at such time as it determines appropriate, file a UCC 1 Financing Statement in such places as it determines to evidence the security interest granted by Customer to Service Provider under this Agreement.

**5.      Network and Access.**

5.1.    Network. Service Provider will provide a minimum of 100mbps of local network connectivity to each piece of Equipment on a single Ethernet segment. Customer is responsible for managing all account passwords and for all network and device security, including providing a firewall for devices Customer utilizes to access Service Provider's network. Customer can allocate the Equipment's computational power to their desired pool with written notification to Service Provider. If Customer does not provide a desired pool prior to installation of Equipment, Service Provider will allocate the Equipment's computational power to any pool of its choice on

DocuSign Envelope ID: 3499B377-24B4-4C9C-82A5-38EE4D4C7ACB

behalf of Customer. Customer can request a change of allocation of computational power to a pool of the Customer's choice with written notification to Service Provider at least 72 hours prior to the desired change.

5.2.     Access. Only those persons specifically authorized by Service Provider may access the Facility. Service Provider may deny or suspend Customer's access to the Equipment based on Service Provider's then-current Security Policies and Procedures including:

5.2.1.  All access into the Facility must be supervised by a Service Provider representative;

5.3.     Hazardous Conditions. If, in the discretion of Service Provider, its employees or agents, any hazardous conditions arise on, from, or affecting the Facility, Service Provider is hereby authorized to suspend service under this Agreement without subjecting Service Provider to any liability.

5.4.     Demand Response/Load Resource Participation Program. If the Facility is located within the state of Texas, Customer understands that Service Provider participates in the Demand Response / Load Resource Participation Program ("LRP Program") for the Texas ERCOT energy grid. The LRP Program is designed to maintain the integrity of the ERCOT grid system. The LRP Program provides ERCOT with the capability to shut off the power load serving Service Provider customers in response to emergency load situations.

**6.       Removals and Relocation of Equipment.**

6.1.     Service Provider may relocate the Equipment within the facility, provided that the site of relocation shall afford comparable environmental conditions for the Equipment and comparable accessibility to the Equipment. Notwithstanding the foregoing, Service Provider shall not arbitrarily or capriciously require Customer to relocate the Equipment. If the Equipment is relocated according to this Section, the cost of relocating the Equipment and improving the Facility to which the Equipment will be relocated shall be borne by Service Provider.

6.2.     If at any time the Equipment not purchased from Service Provider causes unacceptable interference to existing or prospective Service Provider's customers or their Equipment, Service Provider may require Customer to remove or relocate the Equipment at Customer's sole expense. If Customer is unable to cure such interference by relocating the Equipment, Service Provider may terminate this Agreement without further obligation to Customer under this Agreement.

6.3.     In the event of an emergency, as determined in Service Provider's reasonable discretion, Service Provider may rearrange, remove, or relocate the Equipment without any liability to Service Provider. Notwithstanding the foregoing, in the case of emergency, Service Provider shall provide Customer, to the extent practicable, reasonable notice prior to rearranging, removing, or relocating the Equipment.

6.4.     Customer shall not remove any of the Equipment from the Facility without the prior written authorization of Service Provider. Customer will provide Service Provider with written

notification a minimum of thirty (30) days before Customer wishes to remove any of the Equipment from the Facility. Before authorizing the removal of the Equipment, Service Provider will verify that Customer has no payments due. Once Service Provider authorizes the removal of the Equipment from the Facility, Customer will remove such Equipment, and shall be solely responsible to bring appropriate packaging and moving materials. If Customer uses an agent or other third party to remove the Equipment, Customer shall be solely responsible for the acts of such party, and any damages caused by such party to the Equipment or otherwise.

**7.     Customer Responsibilities.**

7.1.     Acceptable Use Policy. Customer shall always use the Equipment and maintain the Facility, in a safe manner and according to Service Provider's then-current Acceptable Use Policy.

7.2.     Compliance with Laws. Customer's use of the Facility and the Equipment located at the Facility, must at all times conform to all applicable laws, including international laws, the laws of the state of Delaware, the laws of the states in which Customer is doing business, and the laws of the state where the Facility is located.

7.3.     Licenses and Permits. Customer shall be responsible for obtaining any licenses, permits, consents, or approvals from any federal, state or local government, which may be necessary to install, possess, own, or operate the Equipment.

7.4.     Insurance. It is understood that Service Provider is not an insurer and Customer Equipment is not covered by any insurance policy held by Service Provider. Customer is responsible for obtaining insurance coverage for the Equipment. Equipment leased by Customer from Service Provider will be covered under policies held by Service Provider. Any balances owed to Service Provider by Customer and claim expenses incurred, including but not limited to attorney, accountant, and investigator fees, will be deducted from any insurance claim payouts before the remainder is released to Customer.

8.     Common Carrier. Service Provider and Customer agree that Service Provider is acting solely as a common carrier in its capacity of providing the Service hereunder, and is not a publisher of any material or information. Furthermore, Service Provider has no right or ability to censor materials or information traversed through Service Provider's networks.

9.     Warranty and Disclaimer. THE SERVICE AND THE FACILITY PROVIDED BY SERVICE PROVIDER IS PROVIDED "AS IS." SERVICE PROVIDER DOES NOT PROVIDE BACKUP POWER AND THE FACILITY IS SUBJECT TO SWINGS IN LOCAL TEMPERATURE, WIND, HUMIDITY, ETC. SERVICE PROVIDER MAKES NO WARRANTY WHATSOEVER, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; or (C) WARRANTY AGAINST INTERFERENCE. SERVICE PROVIDER DOES NOT WARRANT THAT (A) THE SERVICE SHALL BE AVAILABLE 24/7 OR FREE FROM MINOR INTERRUPTIONS; (B) THE SERVICE SHALL MEET CUSTOMER'S REQUIREMENTS OTHER THAN AS SET OUT IN THE DOCUMENTATION; OR (C) THE

SERVICE SHALL PROVIDE ANY FUNCTION NOT DESIGNATED IN THE DOCUMENTATION.

10.    Limitation of Liability.

10.1.    Customer understands and acknowledges that in some situations Equipment functionality may be unavailable due to factors outside of Service Provider' control. This includes, but is not limited to network failures, pool operator failures, denial of service attacks, currency network outages, hacking or malicious attacks on the crypto networks or exchanges, power outages, or Acts of God. SERVICE PROVIDER SHALL HAVE NO OBLIGATION, RESPONSIBILITY, AND/OR LIABILITY FOR THE FOLLOWING: (A) ANY INTERRUPTION OR DEFECTS IN THE EQUIPMENT FUNCTIONALITY CAUSED BY FACTORS OUTSIDE OF SERVICE PROVIDER' REASONABLE CONTROL; (B) ANY LOSS, DELETION, OR CORRUPTION OF CUSTOMER'S DATA OR FILES WHATSOEVER; (C) ANY LOST REVENUE TO CUSTOMER DURING OUTAGES, EQUIPMENT FAILURES, ETC.; (D) DAMAGES RESULTING FROM ANY ACTIONS OR INACTIONS OF CUSTOMER OR ANY THIRD PARTY NOT UNDER SERVICE PROVIDER' CONTROL; OR (E) DAMAGES RESULTING FROM EQUIPMENT OR ANY THIRD PARTY EQUIPMENT.

10.2.    IN NO EVENT SHALL SERVICE PROVIDER BE LIABLE TO CUSTOMER OR ANY OTHER PERSON, FIRM, OR ENTITY IN ANY RESPECT, INCLUDING, WITHOUT LIMITATION, FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS OF ANY KIND OR NATURE WHATSOEVER, ARISING OUT OF MISTAKES, NEGLIGENCE, ACCIDENTS, ERRORS, OMISSIONS, INTERRUPTIONS, OR DEFECTS IN TRANSMISSION, OR DELAYS, INCLUDING, BUT NOT LIMITED TO, THOSE WHICH MAY BE CAUSED BY REGULATORY OR JUDICIAL AUTHORITIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OBLIGATIONS OF SERVICE PROVIDER PURSUANT TO THIS AGREEMENT. EXCLUDING ANY CLAIMS FOR INDEMNIFICATION UNDER SECTION 11, SERVICE PROVIDER' LIABILITIES UNDER THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT LAW, WARRANTY, OR OTHERWISE, SHALL BE LIMITED TO DIRECT DAMAGES NOT TO EXCEED THE AMOUNTS ACTUALLY RECEIVED BY SERVICE PROVIDER FROM CUSTOMER IN THE 3 MONTHS PRIOR TO THE DATE OF THE ACTION GIVING RISE TO THE CLAIM.

10.3.    Customer's sole remedy for performance or non-performance of the terms of this Agreement shall be a refund of any fees paid to Service Provider for the current service month. Unless applicable law requires a longer period, any action against Service Provider in connection with this Agreement must be commenced within one year after the cause of the action has occurred.

10.4.    Customer agrees to look exclusively to Customer's insurer to recover for injury or damage in the event of any loss or injury and releases and waives all right of recovery against Service Provider.

11.     Indemnification. Customer will indemnify, hold harmless, and defend Service Provider, its subsidiaries, employees, agents, directors, owners, executives, representatives, and subcontractors from any liability, claim, judgment, loss, cost, expense or damage, including attorneys' fees and legal expenses, brought by any party on account of the Equipment or Customer's use of the Equipment, or any injuries or damages sustained by any person or property due to any direct or indirect act, omission, neglect or misconduct of Customer, its agents, representatives, employees, contractors and their employees and subcontractors and their employees.

You state and confirm that you shall indemnify, defend and hold harmless our Company, and all members, managers, directors, officers, contractors, employees, agents and joint venturers thereof, against and from any damages, claims, losses, obligations, costs, expenses, debts and liabilities (including, without limitation, attorney's fees) which arise from:

a. Your access to or usage of the Website
b. Violation of any term of the Cookie Policy, the Privacy Policy or the Agreement by you.
c. Violation of third party rights, including but not limited to property, copyright or contractual right, by you.

The obligations in terms of indemnification and defense detailed in this section 12 are to remain in force beyond the end of your Contract Term and your usage of the Website. You accept and agree that it is your duty to defend us against any such claim, and that we may require that you pay for an attorney or attorneys of our choosing in any such case. You agree and accept that this indemnity includes our requiring you to pay for our reasonable attorney fees, disbursements and court costs. In the event of claims such as those described here, we may choose to settle with any party or parties who bring a claim, and you shall remain liable for damages as if a trial had proceeded.

12.     Miscellaneous.

12.1. Lease Agreement. Service Provider leased certain premises in the Facility from the Facility's owner ("Owner") pursuant to a lease agreement ("Lease"). Pursuant to the Lease, Service Provider has the right to execute and enter into this Agreement for certain space located within the Facility. Customer is not a party to or a beneficiary under the Lease and has no rights thereunder.

12.2.   Representations. The parties have not made or relied upon any representations, understandings, or other agreements not specifically set forth in this Agreement.

12.3.   Whole Agreement. This Agreement, the Addendum, and any documents referenced in this Agreement represent the whole Agreement between the parties and is a final, complete and exclusive statement of the terms of this Agreement. No course of prior dealing between the parties shall be relevant or admissible to supplement, explain, or vary any of the terms of this Agreement.

12.4.   Waiver, Severability. The waiver of any breach or default does not constitute the waiver of any subsequent breach or default. If any provision of this Agreement is held to be illegal or unenforceable, it shall be deemed amended to conform to the applicable laws or regulations, or,

if it cannot be so amended without materially altering the intention of the parties, it shall be stricken and the remainder of this Agreement shall continue in full force and effect.

12.5.    Amendment. Amendments, modifications, or supplements to this Agreement must be in writing signed by authorized representatives of both parties.

12.6.    Assignment. Neither this Agreement nor any right or obligation arising under this Agreement may be assigned by Customer in whole or in part, without the prior written consent of Service Provider. Service Provider may at any time assign, transfer, delegate or subcontract any or all of its rights or obligations under this Agreement without Customer's prior written consent. Subject to the restrictions on assignment of this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties, their legal representatives, successors, and assigns.

12.7.    Force Majeure. Neither party shall be liable in any way for delay, failure in performance, loss or damage due to any of the following force majeure conditions; fire, strike, embargo, explosion, power failure, flood, lightning, war, water, electrical storms, labor disputes, civil disturbances, governmental requirements, acts of civil or military authority, acts of God, acts of public enemies, inability to secure replacement parts or materials, transportation facilities, or other causes beyond its reasonable control, whether or not similar to the foregoing. This also includes planned service and maintenance needs.

12.8.    Venue. Any proceeding concerning this Agreement must be brought in a court in the city of Wilmington, Delaware and each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts.

12.9.    Governing Law. This agreement shall be governed by the laws of the State of Delaware.

12.10. Relationship of the Parties. The parties agree that their relationship hereunder is in the nature of independent contractors. Neither party shall be deemed to be the agent, partner, joint venturer or employee of the other, and neither shall have any authority to make any agreements or representations on the other's behalf. Each party shall be solely responsible for the payment of compensation, insurance and taxes of its own personnel, and such personnel are not entitled to the provisions of any employee benefits from the other party. Neither party shall have any authority to make any agreements or representations on the other's behalf without the other's written consent. Additionally, Service Provider shall not be responsible for any costs and expenses arising from Customer's performance of its duties and obligations pursuant to this Agreement.

12.11. Interpretation. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation and construction of this Agreement, and this Agreement shall be construed as having been jointly drafted by the parties. The titles and headings for particular paragraphs, sections and subsections of this Agreement have been inserted solely for reference purposes and shall not be used to interpret or construe the terms of this Agreement.

DocuSign Envelope ID: 3199B377-24B1-4C9C-82A5-38EF1D1C7ACB

12.12. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same document.

## 13.      Communication

Communication between you and us is to be made in writing, including email and alternative electronic messaging formats as and when required.

## 14.      Data Collection and Protection

You agree that your personal data may be processed in the context of the Agreement for the purposes described within it. You also agree that we may store this data beyond the end of the Contract Term until you specifically revoke our permission to do so. If we are required to collect any further data from you in the context of providing services to you, you agree to provide the necessary data to us without delay.

## 15.      Warranty and Representation

You state and confirm to us that you possess knowledge of cryptocurrencies such as Bitcoin and are familiar with the mining process. You also state that you are familiar with the nature and usage of mining these cryptocurrencies. You acknowledge that the responsibility for maintaining your own software and hardware in order to access and make use of the Services is yours, and yours alone.
We do not warrant or guarantee that the Services will be profitable at any time. You agree and accept that you cannot make any claim against us for any amount of Coins under the terms of this Agreement, and we do not warrant or guarantee value of any output whatsoever.
Additionally, you acknowledge that the value of any Coins mined is dependent on the actual price when compared to any given cryptocurrency/fiat. This is the concept of "Market Price Volatility" and is termed as such.
Furthermore, you state and confirm that you are the beneficial owner of all Coins generated.
The content of our Website is provided on the basis of general informational use. The content does not constitute advice, whether formal or informal. We undertake to make reasonable effort to ensure all information listed on our Website is up to date and relevant, but do not make any guarantee, warranty or representation, implied or expressly, that the content of the Website is up to date or complete at any time.

## 16.      Card and Payment Processing

The provisions detailed here apply only to the extent that Services are purchased via debit or credit card.
You acknowledge and agree that if we are unable to continue service provision at any time during the period of your Contract Term, our maximum liability to you is the amount you paid to us at the time our service to you commenced, minus all payments made to you by us up to and including the date that service provision ceased.

We make use of third-party services, and the services of the affiliates of these third parties. Our usage of these third party services enables you to make monetary deposits and transfer payments within our Website by making use of the credit or debit card details you have provided to us, hereby termed as "the Card Services", and "the Card Service Provider"). These Card Services include no additional services, and as such do not include cryptocurrency deposit or provision for your account.

We may transfer and share - including transfer across borders - your personal information with the Card Service Provider. This is done for the purpose of performing the Card Services made to our website through the use of your debit or credit card. Your personal information is shared with the Card Service provider only after you choose to carry out monetary transactions by using the Card Service Provider's Card Services. For the purposes of Section 8, your personal information includes information that can or does identify you as an individual, including the information you submitted to us during the registration process. This may include your location and email address, and/or any additional information you may have provided at the point of registration or during your usage of our services.

Additionally, we may transfer non personal data which you have, through your use of our services or your use of our website, provided to us. This non personal data may be used by the Card Service Provider to verify your status and provide authorization for you to make use of the Card Services of the Card Service Provider. The non-personal data may include your transaction history on the website. This data will be provided without any information which can identify you and is used only for the Card Service Provider's examination and assessment.

By your acceptance of these terms, you state and confirm that all information you provide to us is accurate and correct. The provision of knowingly fraudulent or false information, or the fraudulent use of our Services or the Card Services provided to you, is expressly prohibited. You are not obliged by law to provide us or the Card Service provider with any data whatsoever. You therefore state and agree that you provide us and the Card Service Provider with your personal data freely and willingly, for the purpose of obtaining use of our services, and the services of the Card Service Provider.

By making use of the Card Services, you state and agree that you are prohibited from withdrawing any amounts that you have deposited or are entitled to due to the performance of the Services, for a period of thirty two days.

In the event that a payment by you results in material issues including without limitation charge backs, we are entitled to permanently retain all current and future proceeds from Mining Output.

## 17.    Intellectual Property

Our Website, along with its design and images, writings, templates, text, graphics, scripts, features, logos or trademarks contained within (termed as "Marks") are all licensed to or owned by us, and are subject to intellectual property and copyright laws both of the United States and international conventions. We reserve all rights in and to the website, including those not expressly granted. You agree that you shall not engage in the usage, distribution or copying of any contents or components of the Website without our express permission, in writing. Our Website may contain trademarks or service marks of affiliate or other companies, and these may take the form of logos, graphics or text. Your usage of the Website does not provide you with the license or right to make any use of these service or trademarks unless prior permission is obtained from the corresponding owner of these trade or service marks. Our Website is protected

under international copyright law. Redistributing, copying or publishing any part of this Website by you is prohibited. Your usage of our Website does not entitle you to any stake of ownership of the Website.

## 18.    Severability

Should any provision of term of this Agreement be found unlawful, conflicting or enforceable in any other way, the remainder of the Agreement is to remain in force on the same terms as if the unenforceable provision had not been included at inception. If two or more terms of this Agreement or another Agreement you hold with us are deemed to be in conflict with each other, we reserve the right to choose which provision stays in force.

## 19.    Non-Waiver

All rights permitted to us by this Agreement, as well as any additional rights permitted by applicable law, are reserved by us. If we choose not to enforce any provision of this Agreement or any applicable law, this does not constitute a waiver of our right to enforce the same provision should different or the same circumstances occur at any future time.

## 20.    Assignment and Survival

You are not permitted to assign your obligations and/or rights under the Agreement to any other party or entity without getting written consent from us. We reserve the right to assign our obligations and/or rights under this Agreement at our discretion to any other entity or party. All aspects of the Agreement that would be reasonably believed to survive termination remain in force after termination including without limitation the Representation and Warranties, Licensing, Arbitration, Indemnification and Limitation of Liabilities sections.

By signing this agreement, you agree to the terms as described above. Alterations to this agreement can only be made by Service Provider for reasonable cause and Customer must be notified in writing. Both parties will receive a copy of this agreement and will be responsible for upholding its terms.

**Customer**

Signature: *Michael Enno*
DocuSigned by:
DE3F0B6BDE5F449...

Name (Print): Michael Enno

Date: 3/20/2021

# EXHIBIT B

1
2

**STATE OF WASHINGTON
DEPARTMENT OF FINANCIAL INSTITUTIONS
SECURITIES DIVISION**

3

IN THE MATTER OF DETERMINING
Whether there has been a violation of the
Securities Act of Washington by:

Order No.: S-20-3010-21-CO01

4

CONSENT ORDER

5

VBit Technologies Inc.

6

                                    Respondent

7

8

## INTRODUCTION

9

        Pursuant to the Securities Act of Washington, RCW 21.20, the Securities Division of the Department

10

of Financial Institutions ("Securities Division"), and Respondent VBit Technologies Inc. do hereby enter into

11

this Consent Order in settlement of the matters alleged herein. Respondent VBit Technologies Inc. neither

12

admits nor denies the Findings of Fact and Conclusions of Law as stated below.

13

## FINDINGS OF FACT

14

### Respondent

15

        1.      VBit Technologies Corp. ("VBit") is a Delaware entity formed on July 24, 2018, with its

16

principal place of business in Philadelphia, Pennsylvania. VBit's business is selling Bitcoin mining hardware

17

and associated services, using a multi-level marketing structure.

18

### Nature of the Conduct

19

### Overview

20

        2.      From approximately August 2019 to October 2020, VBit offered and sold approximately

21

$156,000 of Bitcoin mining packages to approximately 82 Washington residents. These mining packages,

22

which combined mining hardware with VBit-provided services, purportedly enabled purchasers to earn

23

Bitcoin with little or no effort on their part.

CONSENT ORDER

**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**Securities Division**
**PO Box 9033**
**Olympia, WA  98507-9033**
**360-902-8760**

**Background**

3.      "Bitcoin mining" refers to the use of the miner's computer (either their personal computer or, more commonly, a computer dedicated specifically to mining) to aid in the processing of Bitcoin transactions. Bitcoin transactions are organized by "blocks," which together form the "blockchain," a public ledger of all transactions using Bitcoin. The first Bitcoin miner to complete a given block is rewarded with a number of Bitcoin (currently 6.25). Because Bitcoin is extremely valuable and only the miner who completes a block receives Bitcoin, mining is extremely competitive, and many Bitcoin miners purchase specialized hardware to mine more quickly and efficiently. Bitcoin miners also commonly join public "mining pools," which combine multiple users' computing power and distribute any Bitcoin rewards to users of the pool in proportion to their contribution of mining power.

**VBit's Mining Packages**

4.      VBit offers packages with two primary components: (a) hardware, in the form of "hashboards" specialized for Bitcoin mining, and (b) accompanying services which enable the purchaser to mine Bitcoin with little to no effort on the purchaser's part. On its website, VBit has advertised to potential purchasers of its services that "[y]ou don't need to do anything regarding the setup or maintenance of your hardware. We take care of logistics, installing and updating software, providing affordable electricity, and keeping your equipment cool and in working order." Generally, the mining hardware and service packages are linked; although VBit offers the hardware on its own, most purchasers buy the hardware together with VBit's hosting services.

5.      VBit further promotes its mining packages by explaining that purchasers do not need Bitcoin mining experience or expertise. In particular, VBit's website has claimed that its "service makes mining Bitcoin accessible to everyone," and that purchasers do not need "to buy expensive equipment and waste [their] time on setting it up." VBit has further advertised that mining package purchasers can mine more cost-

CONSENT ORDER

**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**Securities Division**
**PO Box 9033**
**Olympia, WA  98507-9033**
**360-902-8760**

2

effectively because VBit "operate[s] some of the largest and most efficient mining facilities in the world, with unprecedented access to clean, cheap power and expert staff."

6.      VBit sells its mining packages partly using a multi-level marketing structure, under which purchasers of the mining packages can act as salespersons, recruit other salespersons, and earn commissions based on their sales and the sales of their recruits. VBit does not provide training to its salespersons on how to advertise or explain the mining packages, or on how to avoid misrepresenting the packages to potential customers. Many of VBit's salespersons in Washington had minimal experience with Bitcoin mining or cryptocurrency more broadly, and sold the packages primarily to other, similarly inexperienced persons by advertising the ease of using VBit's mining packages and the potential for substantial passive returns.

**Registration Status**

7.   VBit is not and has never been registered to sell securities in the State of Washington, nor has it filed a claim of exemption from registration.

Based upon the above Tentative Findings of Fact, the following Conclusions of Law are made:

**CONCLUSIONS OF LAW**

1.      The offer and/or sale of the combined Bitcoin mining hardware and service packages, as described above, constitute the offer and/or sale of a security as defined in RCW 21.20.005(14) and (17).

2.      VBit Technologies Inc. has violated RCW 21.20.140, because, as set forth in the Tentative Findings of Fact, it offered and/or sold securities for which no registration is on file with the Securities Administrator.

Based upon the foregoing and finding it in the public interest:

CONSENT ORDER

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

3

**CONSENT ORDER**

IT IS AGREED AND ORDERED that Respondent VBit Technologies Inc., and its agents and employees, each shall cease and desist from violating RCW 21.20.140, the securities registration section of the Securities Act of Washington.

IT IS FURTHER AGREED AND ORDERED that Respondent VBit Technologies Inc. shall be liable for and shall pay a fine of $10,000 on or before the entry of this Consent Order. Payment of the fine shall be deferred until all Washington resident VBit mining package purchasers have been repaid in full.

IT IS FURTHER AGREED AND ORDERED that Respondent VBit Technologies Inc. shall be liable for and shall pay investigative costs of $5,000 on or before entry of this Consent Order. Payment of the investigative costs shall be deferred until all Washington resident VBit mining package purchasers have been repaid in full.

IT IS FURTHER AGREED AND ORDERED that for the $156,000 of Bitcoin mining packages sold to approximately 82 Washington residents as described above, VBit Technologies Inc. shall refund each Washington resident the original price of their mining package, less the value of any Bitcoin mined using their package (calculated as of the date of entry of this order), in exchange for the mining package purchaser's release of any ownership rights to their mining hardware. The refund shall be made in the currency originally used to purchase the package. For any package purchaser who elects not to release such ownership rights, VBit shall send the mining hardware to the purchaser, and shall release the purchaser from any unpaid hosting fees. VBit shall notify the Washington residents of this refund within five business days of the entry of this order, and shall issue refunds or send the mining hardware to the purchasers within 90 days of the entry of this order. After completion of the refund process, VBit shall provide the Securities Division with a summary of refunds made to Washington purchasers not less than 120 days from the date of entry of this order.

IT IS FURTHER AGREED that the Securities Division has jurisdiction to enter this Consent Order.

CONSENT ORDER

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

4

1  IT IS FURTHER AGREED that Respondent VBit Technologies Inc. enters into this Consent Order

2  freely and voluntarily and with a full understanding of its terms and significance.

3  IT IS FURTHER AGREED that in consideration of the foregoing, Respondent VBit Technologies

4  Inc. waives its right to a hearing and to judicial review of this matter pursuant to RCW 21.20.440 and Chapter

5  34.05 RCW.

6  **WILLFUL VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE.**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CONSENT ORDER

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

5

Signed this   <u>18th</u>   day of   <u>June</u>  , 2022.

Signed by:

VBit Technologies, Inc.

<u>   /s                   </u>
Lillian Zhou
CEO

        SIGNED and ENTERED this   <u>12th</u>   day of   <u>July</u>  , 2022.

 

_____
William M. Beatty
Securities Administrator

Approved by:                                 Presented by:

_____    _____
Brian J. Guerard                                    Adam N. Yeaton
Chief of Enforcement                           Financial Legal Examiner

Reviewed by:

_____
Holly Mack-Kretzler
Financial Legal Examiner Supervisor

**CONSENT ORDER**                                          **DEPARTMENT OF FINANCIAL INSTITUTIONS**
**Securities Division**
**PO Box 9033**
**Olympia, WA  98507-9033**
**360-902-8760**

6

# EXHIBIT C



ESG NEWS    COVID-19 NEWS    SERVICES    CONTACT US    FRANÇAIS    SIGN IN

REGISTER



# VBit Technologies Acquired by Advanced Mining Group in a Huge $105M Deal

## Company Expects New Rapid Growth and Reveals New Plans

January 31, 2022 13:00 ET | Source: VBit Technologies





...

PHILADELPHIA, Jan. 31, 2022 (GLOBE NEWSWIRE) -- Today, VBit Technologies, a U.S.-based hosting hardware mining company, announced its full acquisition by Advanced Mining Group, an Asian-based company primarily focused on bitcoin mining, in order to secure its future as a leading mining services provider in North America and also reach newly set goals.

A 105-million-dollar deal consisting of cash and stock options has been legally closed on Jan. 31, 2022.

As a company that has been thriving in the crypto mining sector since 2015 and operating 12 data centers dedicated to bitcoin mining in Europe and Asia, Advanced Mining is expected to accelerate VBit's growth and build a stronger position in the global market.

Don Vo, CEO and founder of VBit, elaborated on the decision and future plans :

"After working tirelessly to build VBit over the last 4 years, I felt that it was time to bring it to new heights, which I am sure that a company such as Advanced Mining with its extensive expertise in the field can do."

He also announces Advanced Mining's intention of taking the company public within the next three years, and continued:

"In addition to me being a firm believer that VBit's future is bright, I also trust its mission to bring cryptocurrency adoption to the masses by making things simple for people to understand and get involved will be honored



ESG
NEWS

COVID-
19
NEWS

SERVICES

CONTACT
US

FRANÇAIS

SIGN IN

REGISTER



27,000 Antminer S19 series and S17 series out of five data centers spreading across the globe in the United States, Canada and Kazakhstan with a new data center currently being built in the United States. Over the course of almost four years in operation, VBit has helped its clients mine over $100M in bitcoin with exponential growth year over year.

Starting today, it will join the Advanced Mining family, embracing the Advanced Mining brand and operate under it.

Press Contact: marketing@vbitmining.com

Related Images



Image 1: Vbit and Advanced Mining

Vbit and Advanced Mining



ESG
NEWS

COVID-
19
NEWS

SERVICES ˅

CONTACT
US

FRANÇAIS

SIGN IN

REGISTER



Image 2: Don Vo

CEO and founder of VBit

This content was issued through the press release distribution service at Newswire.com

Vbit and Advanced Mining



Vbit and Advanced Mining

---

Tags

acquisition    antminer    bitcoin    bitcoin mining    crypto    data centers

philadelphia



ESG
NEWS

COVID-
19
NEWS

SERVICES ⌄

CONTACT
US

FRANÇAIS

SIGN IN

REGISTER







[CFA Society Toronto Welcomes New CEO](#)

October 04, 2022 13:22 ET

[Chaos Connects V-Ray 6 for SketchUp and Rhino to E...](#)

October 04, 2022 13:03 ET



About Us

GlobeNewswire is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases, financial disclosures and multimedia content to media, investors, and consumers worldwide.

Follow us on social media:    

Newswire Distribution Network & Management

· [Home](#)

· [RSS Feeds](#)

· [Newsroom](#)

· [Legal](#)

GlobeNewswire is a newswire distribution network. Articles and other content published by GlobeNewswire are the legal responsibility of the author and GlobeNewswire accepts no liability for the content of such material. GlobeNewswire publishes content for informational purposes and makes no representations regarding, recommendation or invitation to engage in, any form of financial or investment activity, and does not endorse the content of any material published.

© 2022 GlobeNewswire, Inc. All Rights Reserved.